## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO.:  0:20-60683-WPD-CIV-DIMITROULEAS/SNOW

JANE DOE,

              **Plaintiff,**

    **v.**

RICKEY PATEL, LLC d/b/a VACATION INN,
SKY MOTEL, INC., LQ FL PROPERTIES LLC
n/k/a CPLG FL PROPERTIES LLC d/b/a LA
QUINTA INN FORT LAUDERDALE
TAMARAC EAST #4006, LQ FL PROPERTIES
LLC n/k/a CPLG FL PROPERTIES LLC
d/b/a  LA QUINTA INN located at 7901 SW 6TH
ST PLANTATION, FL and MW PLANTATION,
LP d/b/a SAWGRASS INN & CONFERENCE
CENTER,
              **Defendants.**
_____/

### PLAINTIFF'S RESPONSE TO MOTION TO DISMISS
### FILED BY DEFENDANT CPLG FL PROPERTIES LLC

This case comes to the Court on the cutting edge of federal legislation intended to empower

victims of human trafficking. That legislation expressly enables survivors like Jane Doe to pursue

claims against businesses that chose to look the other way while facilitating and reaping profits

from the sexual exploitation of human beings.  Through its motion to dismiss (Doc. 171), CPLG

FL Properties LLC's ("La Quinta") asks this Court to ignore both the purpose and the plain

language of the statute.  The motion should be denied.

### MEMORANDUM OF LAW

**Brief legal background**

Because this case involves a relatively new federal statute, Ms. Doe believes it would aid

1

the Court to have a factual framework as it analyzes the motions to dismiss.

According to the 2019 Trafficking in Persons (TIP) Report, there are 24.9 million total victims of human trafficking today; that is about three times the population of New York City.  In 2018, worldwide, 11,000 traffickers were prosecuted compared to the 85,613 victims identified. https://www.state.gov/wp-content/uploads/2019/06/2019-Trafficking-in-Persons-Report.pdf.

These numbers are staggering because the profit to be made from the sexual exploitation of women, often children, is itself staggering.  According to a 2016 United States Department of Homeland Security report, the sexual exploitation of minors generates billions of dollars each year in illegal proceeds, making it more profitable than any transnational crime except drug trafficking. (sex trafficking yielded $99 billion worldwide in 2014).  International Labour Office, *Profits and Poverty: The* Economics *of Forced Labour* (2014), at 13, *available at* https://www.ilo.org /wcmsp5/groups/public/---ed_norm/---declaration/documents/publication/wcms_243391.pdf.

And the numbers are growing. The Department of Justice has reported that more than half of the sex-trafficking victims are 17 years old or younger. In 2014, the National Center for Missing  and  Exploited Children reported an 846% increase from 2010 to 2015 in reports of suspected  child sex trafficking—an increase the organization has found to be "directly correlated to the increased use of  the  internet  to  sell  children  for  sex." The State of Florida has not escaped this horrific trend, ranking third in the United States in human trafficking cases reported by the states.  Only the far larger states of California and Texas have more reported cases.

Hotels, including those owned and operated by the defendants in this case, play integral roles in aiding sex trafficking. According to the Polaris Project, the non-profit entity that has operated the U.S. National Human Trafficking Hotline for over a decade and analyzes the data gathered from the hotline, in 2014, 92% of the calls it received involved reporting sex trafficking

at hotels and motels; the remaining two percent reported a combination of sex and labor trafficking.[1]  Even estimates by attorneys *for* the hospitality industry indicate that eight (8) out of ten (10) arrests for human trafficking occur in or around hotels.[2]  The Polaris Project found that "75% of [sex trafficking] survivors responding to Polaris' survey reported coming into contact with hotels at some point during their exploitation…. Unfortunately, 94% also disclosed that they never received any assistance, concern, or identification from hotel staff."[3]

Without the complicity of hotels, where illicit sexual encounters are taken off the street and cloaked in the anonymity of a hotel's customers, the sex trafficking industry in the United States would be hugely disrupted. This obvious fact has been noted by experts[4] and justices of the United States Supreme Court.  In 2015, Justice Antonin Scalia, joined in dissent by Chief Justice John Roberts and Justice Clarence Thomas, noted that,

> Motels . . . are also a particularly attractive site for criminal activity ranging from drug dealing and prostitution to human trafficking.  Offering privacy and anonymity on the cheap, they have been employed as . . . rendezvous sites where child sex workers meet their clients on threat of violence from their procurers.

---

[1] *Human Trafficking and the Hotel Industry*, Polaris Project, https://polarisproject.org/sites/default/files/human-trafficking-hotel-industryrecommendations.pdf (last visited Aug. 3, 2019).

[2] Rich Keating, *Human Trafficking: What It Is And How It Impacts The Hospitality Industry*, Presentation Delivered At AHIA Sprint Conference 2013, Washington, D.C., *available at* http://www.ahiattorneys.org/aws/AHIA/asset_manager/get_file/92983 (last visited Mar. 1, 2019).

[3] *Hotels and Motels Recommendations*, The Polaris Project, https://polarisproject.org/hotels-motelsrecommendations (last visited Aug. 8, 2019).

[4] Hotel/Motel-Based, National Human Trafficking Hotline, https://humantraffickinghotline.org/sex-traffickingvenuesindustries/hotelmotel-based (last visited Aug. 3, 2019) ("Hotels and motels are a common venue for sex trafficking, due to ease of access for buyers, ability to pay in cash and maintain secrecy through finances, and lack of facility maintenance or upkeep expenses."); *see also* Avni Ahuja, *Sex Trafficking Prevention in Georgia: Equipping Hotel Workers with the Proper Resources*, The Roosevelt Institute, (2017), *available at http://rooseveltinstitute.org/wp-content/uploads/2017/05/715_Final-3-2.pdf* (last visited Aug. 3, 2019) ("Hotels and motels represent a disproportionate site of sex trafficking due to the privacy and anonymity they offer to traffickers, customers, and victims.").

*City of Los Angeles, Calif. v. Patel*, 135 S. Ct. 2443, 2457 (2015) (Scalia, J., dissenting; joined by Roberts, J. and Thomas, J.).  Rather than take measures to prevent human trafficking, such as training staff as to what to look for and how to respond, these hotels and motels, and their respective parent companies, have failed to address the open and obvious presence of human trafficking on hotel properties and continued to profit from traffickers renting rooms for the explicit and readily apparent purpose of human trafficking.

The Trafficking Victims Protection Act ("TVPA"), first enacted in 2000, is the national framework for the federal response to human trafficking.  Victims of Trafficking and Violence Protection Act of 2000, PL 106–386 (Division A), Oct. 28, 2000, 114 Stat 1464.  This original legislation created only criminal offenses for forced labor and sex trafficking.  *A.B. v. Marriott Int'l, Inc.*, CV 19-5770, 2020 WL 1939678, at *6 (E.D. Pa. Apr. 22, 2020).

In 2003, Congress passed the Trafficking Victims Protection Reauthorization Act of 2003 ("TVPRA"), which is located at 18 U.S.C. § 1595.  Trafficking Victims Protection Reauthorization Act of 2003, PL 108–193, Dec. 19, 2003, 117 Stat 2875.  Congress found that, since the enactment of the 2000 legislation, the United States "made significant progress in investigating and prosecuting acts of trafficking and in responding to the needs of victims of trafficking in the United States and abroad [but] [o]n the other hand, victims of trafficking have faced unintended obstacles in the process of securing needed assistance ...."  *Id*.  As such, the amendment created a civil right of action for victims to bring against their traffickers, but against traffickers only.  *A.B.*, 2020 WL 1939678, at *6.

In 2008, Congress amended the statute again, this time giving "victims a cause of action against those who have profited from their exploitation" and "creates a cause of action for victims of any violation of chapter 77 ***against anyone who benefits from any such a violation***."  Charles

4

Doyle, Cong. Research Serv., R40190, The William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008 (P.L.110-457): Criminal Law Provisions (2009) (emphasis added). With this amendment, § 1595 "opened the door for liability against facilitators who did not directly traffic the victim, but benefitted from what the facilitator should have known was a trafficking venture."  Gallant Fish, *No Rest for the Wicked: Civil Liability Against Hotels in Cases of Sex Trafficking*, 23 BUFF. HUM. RTS. L. REV. 119, 138 (2011) (footnotes omitted).

The TVPRA has been updated five times, most recently in January 2019, with strong bipartisan support.

## ARGUMENT

I.    **Ms. Doe has stated a claim under 18 U.S.C. § 1595.**

A.  **Ms. Doe properly alleged that La Quinta "participated in a venture."**

The civil action component of the TVPRA provides that:

> An individual who is a victim of a violation of this chapter may bring a civil action against the perpetrator (or whoever knowingly benefits, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of this chapter) in an appropriate district court of the United States and may recover damages and reasonable attorneys fees.

18 U.S.C. § 1595(a).  La Quinta argues that Ms. Doe must allege that La Quinta "participated in a sex-trafficking venture" and that she must allege that the trafficker and the hotel were "associated in fact."  Doc.171, p.4.

Like its co-defendants, to reach this conclusion, La Quinta grafts the definitions for criminal conduct under the TVPRA, found in § 1591, onto the civil component of the TVPRA, § 1595 (the provision under which Ms. Doe filed her complaint).  Doc.171, p.4.  Specifically, La Quinta says that "venture" is defined in § 1591(e)(6) as "any group of two or more individuals associated in fact" and La Quinta then takes the definition of "venture" in the criminal statute and

compares it to the definition of "enterprise" in the Racketeer Influenced and Corrupt Organizations Act, both of which require "association in fact."  Doc.171, p.4.  La Quinta argues that use of similar language in these two different criminal statutes requires a presumption that Congress intended the same meaning to apply to the use of the word "venture" in § 1595(a), the civil statute under which Ms. Doe is proceeding.  Doc. 171, p.4.  La Quinta posits that rental of a hotel room "does not give rise to a reasonable inference that" the traffickers and La Quinta "shared any common purpose, operated as a continuing unit, or otherwise 'associated in fact.'"  Doc. 171, p.5.

La Quinta cites no case supporting the conclusion that the RICO definition of "enterprise" should apply to the current version of TVPRA.  La Quinta cites to a 2014 Northern District of Georgia case, *Plaintiff A v. Schair*, 2:11-CV-00145-WCO, 2014 WL 12495639, at *1 (N.D. Ga. Sept. 9, 2014), in support of its position.  But that case did not say that RICO definitions apply to the TVPRA.  *Schair* said only that ""[t]he TVPA's civil remedy operates in the same manner as the federal Racketeer Influenced and Corrupt Organizations Act ('RICO). Under both statutes, a plaintiff prevails by proving a qualifying "predicate act.'"  *Id*. at *2. Moreover, the *Schair* case was decided under the 2003 TVPRA.  ("Plaintiffs maintain that defendants' actions violated the Trafficking Victims Protection Act **of 2003** [ ], which prohibits the use of "coercion" to cause a minor to engage in a commercial sex act. 18 U.S.C. § 1591(a).")  *Id*. at *2 (emphasis added).  And the court specifically noted that the 2008 amendment to the TVPRA changed the statute "in several substantial aspects, all of which make it easier for victims of trafficking violations to bring civil suits."  *Id*. at *3.  And *Boyle v. United States*, 556 U.S. 938 (2009), the other case La Quinta cites, does not support La Quinta's position because it was not even a TVPRA case.  It was a bank burglary/RICO case.  *Id*. at 940.

Really though, the argument defies simple logic. "Enterprise" and "venture" are two

different words.  It is a cardinal rule of statutory interpretation that Congress knows how to pick its words—and where Congress uses different words, it presumed that Congress did so for a reason.

To the extent La Quinta suggests that the word "venture" is used in both § 1591 and § 1595 and there is a presumption that they should have the same meaning (La Quinta argues the meaning for both should be "association in fact"), La Quinta is wrong.  Doc.171, p.4.  The "natural presumption that identical words used in different parts of the same act are intended to have the same meaning ... is not rigid and readily yields whenever there is such variation in the connection in which the words are used as reasonably to warrant the conclusion that they were employed in different parts of the act with different intent." *Atlantic Cleaners & Dyers v. United States*, 286 U.S. 427, 433 (1932); *see also Yates v. United States*, 574 U.S. 528, 537 (2015) ("In law as in life, [ ] the same words, placed in different contexts, sometimes mean different things."). As noted in *M.A. v. Wyndham Hotels & Resorts, Inc.*, 425 F. Supp. 3d 959, 964 (S.D. Ohio 2019), on its face "§ 1591(e) purports to only apply to 'this section,' i.e., § 1591." 425 F. Supp. 3d at 969. Thus, giving meaning to the words "in this section," the definition of "venture" found in § 1591(e)(6) would not apply to § 1595.  *TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001) (noting that a cardinal rule of statutory interpretation is to give effect to all words in a statute).

Indeed, the District Court of Colorado has expressly declined to define the term "venture" from § 1591(e) to another statute.  In *Gilbert v. U.S. Olympic Committee*, No. 18-cv-00981-CMA-MEH, 2019 WL 1058194, at *9, *10 (D. Colo. Mar. 6, 2019), the court had to determine what "venture" meant for the purposes of § 1589(b).  The defendant in that case argued that "venture" was defined in § 1591(e)(6) and that this definition should apply to § 1589.  But the *Gilbert* court refused to interject the criminal definition into the civil provisions, explaining: "Congress appears to have confined this definition only to § 1591." *Id.* at *10 ("*In this section* ... [t]he term 'venture'

means any group of two or more individuals associated in fact, whether or not a legal entity.") (emphasis added). The *Gilbert* court further noted that "neither §§ 1589 nor 1595 define 'venture'"—which also gives rise to an inference that Congress did not intend the definition in § 1591 to apply to other sections. *Id*.

Additionally, grafting the criminal definition in § 1591 onto the civil act under which Ms. Doe has brought her complaint would defy the purpose of the civil act. As noted by Judge Marbley in the Southern District of Ohio, the text of § 1595 "evidences Congress's intent to broaden the behavior that can form the basis of civil liability to participation in ventures where the defendant 'knew or should have known' that the venture was involved in sex trafficking." *M.A. v. Wyndham Hotels & Resorts, Inc.*, 425 F. Supp. 3d 959, 964 (S.D. Ohio 2019). The *M.A.* case cites to a Report from the Congressional Research Service which interpreted the amendments to the TVPRA to "create[ ] civil liability both for those who face criminal liability for their profiteering ***and those who do not***." *Id*. (citation omitted) (emphasis added); *see also Plaintiff A v. Schair*, No. 2:11-cv-00145-WCO, 2014 WL 12495639, at *3, (N.D. Ga. Sept. 9, 2014) (noting that the 2008 amendments to the TVPRA "ma[de] it easier for victims of trafficking violations to bring civil suits" by broadening the parties who could be sued for trafficking violations to "anyone who 'knowingly benefits…from participation in a venture which that person knew or should have known has engaged in an act in violation of this chapter.'").

Put simply, § 1595(a) does not require a victim of sex trafficking to establish that the hotel defendant and her trafficker were "associated in fact" and no case has imposed such a requirement in a civil action, so this Court should not impose such a requirement.

As a variation on that argument, La Quinta also argues that "participation in a venture" under § 1595 "requires some 'overt act' in furtherance of the venture." Doc. 171, p.6. In support,

La Quinta cites to a criminal case involving a different statute, *U.S. v. Afyare*, 632 F. App'x 272, 286 (6th Cir. 2016). La Quinta then cites to two decisions relying on *Alfayre*, one from the Southern District of New York, *Noble v. Weinstein*, 335 F. Supp. 3d 504 (SD NY 2018), and the other from the Northern District of Georgia, *Doe 1 v. Red Roof Inns, Inc. et. al*, 1:19-CV-03840-WMR, 2020 WL 1872335, at \*3 (N.D. Ga. Apr. 13, 2020). La Quinta neglects to mention the authority finding that requiring an overt act would subvert both the purpose and the actual language of the TVPRA.

**The purpose of § 1595(a) requires rejection of the hotels' argument.**

As mentioned above, the TVPRA's amendment reflects Congressional intent to allow victims of sex trafficking to pursue civil remedies against their traffickers even if criminal remedies are not available. *See* pp.2 to 4 above; *see also M.A.*, 425 F. Supp. 3d at 964. Because the civil component of the TVPRA was intended to cast a much broader net than the criminal component of the TVPRA, La Quinta's citation to the criminal case of *United States v. Afyare*, 632 F. App'x 272 (6th Cir. 2016) and the § 1595 cases that have relied upon *Afyare* is misplaced. That fact was addressed at length in the *M.A.* case, where the hotel defendants also argued that the *Afyare* opinion should control how a court interprets the civil component of the TVPRA.

**The plain language of § 1595(a) reflects that no overt act is necessary.**

Both the Southern District of Ohio and the Eastern District of Pennsylvania have found that the plain language of § 1595 refutes the hotel defendants' arguments that there must be actual participation (an overt act) in the sex trafficking. In construing a statute, a court must start with the language of statute. *See Bailey v. United States*, 516 U.S. 137, 145 (1995). But even a textual analysis is informed "not only [by] the bare meaning of the word but also [by] its placement and purpose in the statutory scheme." *Id.* "Where, as here, a statute is 'remedial,' it 'should be liberally construed.'" *M.A.*, 425 F. Supp. 3d at 969 (quoting *Peyton v. Rowe*, 391 U.S. 54, 65 (1968)); *Noble*

*v. Weinstein*, 335 F.Supp.3d 504, 515 (S.D.N.Y. 2018) (finding that § 1595 is a "remedial provision" that "requires broad interpretation")). In *Afyare*, "the Sixth Circuit panel looked to the statutory definitions and to the surrounding context," *M.A.*, 425 F. Supp. 3d at 969, when it held that the government must prove that a criminal defendant participated in the sex trafficking venture through an "'overt act' that furthers the sex trafficking aspect of the venture" and that "the defendants associated for the purpose of further the sex trafficking." *Afyare*, 632 F. App'x at 286.

But, as noted by the *M.A.* court, "the language of § 1591 differs from the language of § 1595—the former does not have a constructive knowledge element manifested by 'should have known' language." *M.A.*, 425 F. Supp. 3d at 969. More specifically, the criminal statute, § 1591 says that "In this section…[t]he term 'participation in a venture' means ***knowingly*** assisting, supporting, or facilitating a violation of subsection (a)(1)." 18 U.S.C.A. § 1591(e)(4) (emphasis added). In contrast, § 1595 says there is liability for "participation in a venture which that person ***knew or should have known*** has engaged in an act in violation of this chapter." 18 U.S.C. § 1595(a) (emphasis added). There is an obvious difference between "knowingly" and "knew or should have known."

More importantly, "applying the definition of 'participation in a venture' provided for in § 1591(e) to the requirements under § 1595 would void the 'known or should have known' language of § 1595." *M.A.*, 425 F. Supp. 3d at 969. Such a construction would violate the "'cardinal principle of statutory construction' that 'a statute ought, upon the whole, to be construed so that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant.'" *Id*. (quoting *TRW Inc.*, 534 U.S. at 31 (quoting *Duncan v. Walker*, 533 U.S. 167, 174, 121 S.Ct. 2120, 150 L.Ed.2d 251 (2001))). Section 1591(e)(4) says that "participation in a venture" means "knowingly assisting, supporting, or facilitating a violation of subsection (a)(1)." Thus,

"participation in a venture" in § 1591 conveys a state of mind requirement—the participation must be "knowing."   *M.A.*, 425 F. Supp. 3d at 969.  This is unlike § 1595, which allows liability for knowing or "should have known."  *Id.*

Additionally, "[a]lthough § 1591(a)(2) also criminalizes some action taken with less than actual knowledge, that is, 'reckless disregard,' such 'reckless disregard' provision applies only to the requirement 'that means of force, threats of force, fraud, coercion described in subsection (e)(2), or any combination of such means will be used to cause the person to engage in a commercial sex act, or that the person has not attained the age of 18 years and will be caused to engage in a commercial sex act.'" *Id.* (quoting § 1591 (a)). The reckless disregard standard "does not lessen the scienter requirement of actual knowledge as to *participation* or the *venture's true ends.*"  *M.A.*, 425 F. Supp. 3d at 970.

For these reasons, the Southern District of Ohio found in *M.A.* that "participation' under § 1595 does not require actual knowledge of participation in the sex trafficking itself."  *Id.*  In other words, hotels "need not have actual knowledge of the sex trafficking in order to have participated in the sex trafficking venture for civil liability under the TVPRA, otherwise the 'should have known' language in § 1595(a) would be meaningless."   *Id.* at 971; *see also A.B.*, 2020 WL 1939678, at *13 ("If we imputed this ['knowing'] standard [from § 1591] into section 1595—which does ***not*** define 'participation in a venture'—we would ignore its 'knew or should have known' language.").

In its rejection of the "overt act" requirement the Eastern District of Pennsylvania specifically addressed the hotel defendants' reliance on *Afyare* and on *Noble v. Weinstein*, 335 F. Supp. 3d 504, 523 (S.D.N.Y. 2018), two of the cases upon which La Quinta relies in its motion to dismiss.  *A.B.*, 2020 WL 1939678, at *13.  In addition to pointing out that *Afyare* was a criminal

case dealing with § 1591 as opposed to § 1595, the court in *A.B. v. Marriott International, Inc*., also noted that the *Noble* court did not apply an "overt act" requirement; so, reliance on *Noble* for such a position was equally misplaced.  *Id*.  The *A.B*. court went on to say that, "like the [*M.B.* court], we interpret section 1595 as distinct from section 1591's criminal liability."  *Id.* at *9.  The *A.B*. court said that *Noble*, relying on *Afyare*, "essentially required the victim of sex trafficking seeking a civil remedy to first prove a criminal violation of section 1591(a)(2)" and that "[w]e disagree with the reasoning in *Noble*, adopted by the judge in the *Red Roof* cases [cited at page 6 of La Quinta's motion to dismiss], requiring a victim seeking a civil remedy under section 1595 must first prove the criminal offense."  *Id*. at *13.  "We do not read the language of section 1595 to impose such a burden nor do we interpret the Act as Congress intended such a restrictive reading of the remedial nature of section 1595."  *Id*.  The *A.B*. court said, "we will not impose a 'knowingly' state of mind requirement to section 1595 [a.k.a., an "overt act" requirement] and ignore language Congress specifically included allowing a civil action against facilitators who should have known about a sex trafficking venture."  *Id*. at *14.

*M.A. and A.B.* are not alone in reaching the conclusion that section 1595 does not require an "overt act" or participation that furthers the sex trafficking.  The *M.A.* opinion itself cites to *Jean-Charles v. Perlitz*, 937 F.Supp.2d 276, 288–89 (D. Conn. 2013), where the District of Connecticut found that defendants participated in a sex-trafficking venture where they maintained affiliations with a school where sexual abuse of minors was taking place.  425 F. Supp. 3d at 970. "The court did not require the priest to have directly participated in the sex trafficking."  *A.B*., 2020 WL 1939678, at *16, n.113.

Put simply, requiring an overt act is the equivalent of requiring "knowing" participation (otherwise the act would not be "overt") and § 1595 does not requiring a "knowing" standard, only

a "knew or should have known" standard.  La Quinta ignores the plain language of § 1595(a) in

arguing to the contrary.

**The Third Amended Complaint state pleads facts sufficient to establish that La Quinta "participated in a venture" under § 1595(a).**

Having determined that no association in fact or overt act is necessary, the question is

whether Ms. Doe alleged facts sufficient to infer that La Quinta "participated in a venture" under

§ 1595(a).  In *M.A.*, the court denied the hotels' motions to dismiss where the trafficking victim

alleged facts very similar to those alleged here.  The *M.A.* court said that, "in the absence of a

direct association, Plaintiff must allege at least a showing of a continuous business relationship

between the trafficker and the hotels such that it would appear that the trafficker and the hotels

have established a pattern of conduct or could be said to have a tacit agreement."  425 F. Supp. 3d

at 971.   The *M.A.* court noted that *Ricchio v. McLean*, the case relied upon by La Quinta,

represented one end of a "spectrum for civil liability based on sex trafficking activities"; but failure

to "rise to the level of obviousness present in *Ricchio*" did not mean a plaintiff could not state a

claim under § 1595.  *Id*. at 966.  Indeed, the *M.A.* court found that the Plaintiff alleged sufficient

facts to show Defendants "participated in a venture" under § 1595 "by alleging that Defendants

rented rooms to people it knew or should have known where engaged in sex trafficking."  *Id*.  The

specific facts in *M.A.* were:

> • The "trafficker often requested rooms near exit doors. Frequently the trash cans
> in the rooms in which M.A. was trafficked would contain an extraordinary number
> of used condoms. The trafficker routinely instructed M.A. to refuse housekeeping
> services. The hotel rooms in which M.A. was trafficked were frequently paid for
> with cash." (ECF No. 1 at ¶ 52).
> • The hotels "failed to recognize or report Plaintiff M.A.s trafficking." (ECF No. 1
> at ¶ 53).
> • "The Plaintiff observed some of the same hotel staff over the course of the time
> she was trafficked for sex at the Defendant hotel properties." (ECF No. 1 at ¶ 54).

• "At each of the Defendants' hotel properties, M.A. was routinely escorted by her trafficker in view of the front desk after her trafficker paid in cash for the reserved room out of which the sex trafficking venture was housed." (ECF No. 1 at ¶ 54).

• "Despite her desperate pleas and screams for help, after being beaten or choked at the Defendants' hotel properties, the hotel staff ignored her and did nothing to prevent the ongoing and obvious torture she endured while she was regularly trafficked for sex at Defendants' hotel properties." (ECF No. 1 at ¶ 55).

• "The Plaintiff's trafficker operated the sex trafficking venture out of the same hotel room for multiple days or weeks in succession." (ECF No. 1 at ¶ 56).

• "The Plaintiff was forced into sexual encounters with approximately ten (10) "johns" per day, and these johns would enter and leave the hotel guest room." (ECF No. 1 at ¶ 56).

*Id*. at 968.  In addition, the plaintiff in M.A. also alleged that the hotels failed to adequately train their staff to deal with trafficking.  *Id*.  The court said, "[t]hese allegations are sufficient to survive a 12(b)(6) motion to dismiss."  *Id*.

Here, Ms. Doe alleged that both La Quinta hotels:

…participated in the venture of trafficking Plaintiff by providing the location for the sexual exploitation to take place.  Without a "safe" location (one such as La Quinta #4006, where the hotel turns a blind eye to red flags and does nothing to prevent trafficking or protect the victim), there can be no trafficking.

[that their] cooperation in the venture exceeded that inherent in the normal room renting transaction because La Quinta #4006 elected to ignore red flags that Plaintiff was being trafficked.  La Quinta #4006 knew or should have known that Plaintiff was being sexually exploited in violation of the TVPRA.  Plaintiff exhibited red flags upon which La Quinta #4006's staff should have been trained to act.

[and that they] took no steps, and thereby affirmatively avoided, confirming that Plaintiff was a human trafficking victim being exploited on La Quinta [ ] property.  In fact, La Quinta [ ], like most other La Quinta properties, has refused to sign the Hotel Code of Conduct, which would call on the La Quinta to be on the lookout for red flags like those described above.

Doc. 164, pp.17-18, ¶ ¶ 83, 84, 86; pp.20-21, ¶ ¶ 92-95.  As to each La Quinta, the red flags that Ms. Doe alleged the hotels ignored included:

[as to La Quinta #4006] that a girl in her late teens or early twenties (who looked her age or even younger) having Elite status and over 20,000 "rewards points" in the La Quinta rewards program.  At 10 points per dollar spent, that would amount

to having spent over $2,000 in room stays.  Plaintiff always paid for the room in cash or an Amscot debit card.  Plaintiff would stay for three to four days at a stretch, leave, and then come back.  Plaintiff checked in with a purse and perhaps a small bag, nothing else.  Plaintiff would only pay for one night at a time, renewing her stay before check-out the next day.  Johns would enter the room with no luggage, stay approximately 20 minutes, and then leave.  Plaintiff's trafficker was a very tall man (approximately 6' 4") and he was constantly present and hiding the drugs to which he had addicted Plaintiff all over the hotel.  When Plaintiff would finish with a John, the trafficker would tell her where to find her next drug hit.  The trafficker hid drugs over emergency exit signs, in stairwells, on top of doorways, etc.  The hotel had security cameras and no one said a word or questioned any of the strange behavior.  Plaintiff always turned away housekeeping and asked to change her own linens.  She would put her trash outside her door.  Plaintiff made friends with two of the male managers at the La Quinta #4006.  These managers knew what was happening and did nothing to stop it; they always rented a room to Plaintiff when she would return.

(Doc.164, p.18, ¶ 85) and

[as to La Quinta Tamarac that] a girl in her late teens or early twenties  (who looked her age or even younger) having Elite status and over 20,000 "rewards points" in the La Quinta rewards program.  At 10 points per dollar spent, that would amount to having spent over $2,000 in room stays.  Plaintiff always paid for the room in cash or an Amscot debit card.  Plaintiff would stay for two to three days at a stretch, leave, and then come back.  Plaintiff was sexually exploited approximately 10 to 20 times per day.  Plaintiff's trafficker was a very tall man (approximately 6' 4") and he was constantly present and hiding the drugs to which he had addicted Plaintiff all over the hotel.  When Plaintiff would finish with a John, the trafficker would tell her where to find her next drug hit.  The trafficker hid drugs over emergency exit signs, in stairwells, on top of doorways, etc.  The hotel had security cameras and no one said a word or questioned any of the strange behavior.  Plaintiff always turned away housekeeping and asked to change her own linens and she would put her trash outside her door.

Doc.164, p.20, ¶ 94.

These facts contain the same kind of information as the allegations in *M.A.* Accordingly, these allegations are more than enough to give rise to an inference that Sky Motel and Vacation Inn "knew or should have known," 18 U.S.C. § 1595(a), that Ms. Doe was being trafficked and that "it would appear that the trafficker and the hotels have established a pattern of conduct or could be said to have a tacit agreement." *M.A.*, 425 F. Supp. 3d at 971; *see also Somaza v.*

*Loancare, LLC*, 17-CV-60976, 2017 WL 7796058, at *1 (S.D. Fla. July 14, 2017) ("Under Rule 12(b)(6), a motion to dismiss should be granted only if the plaintiff is unable to articulate "enough facts to state a claim to relief that is plausible on its face.  A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable  inference that the defendant is liable for the misconduct alleged.") (citations omitted).

### B. Ms. Doe alleged that La Quinta knowingly benefitted financially/received something of value

In *M.A.*, like here, the hotel defendants argued that "merely receiving revenue from the rental of a hotel room" could not constitute a benefit under the TVPRA. 425 F. Supp. 3d at 964. La Quinta's specific argument is that "renting rooms to Plaintiff" is "insufficient" to constitute receiving a benefit under the TVPRA.  Doc. 171, p.9.  La Quinta also argues, like the defendants in *M.A* that the proper standard for "benefit" is the standard articulated in *Geiss v. The Weinstein Company Holdings, LLC, et al.*, 383 F.Supp.3d 156 (S.D.N.Y. 2019).  *M.A.*, 425 F. Supp. 3d at 964; Doc.171, p.9.   In *Weinstein*, the Southern District of New York said that the plaintiff must show that the trafficker "provided any of those benefits to [Defendants] because of [Defendants'] facilitation of [the trafficker's] sexual misconduct." *Geiss*, 383 F.Supp.3d at 169.  Building on *Geiss*, La Quinta argues that "the 'benefit' must be derived directly 'from,' and be 'knowingly' received in exchange for, participating in the venture committing sex-trafficking crimes."  Doc. 171, p.9.

But both the Southern District of Ohio and, just six weeks ago, the Eastern District of Pennsylvania, have rejected that logic.  In *H.H. v. G6 Hosp., LLC*, 2:19-CV-755, 2019 WL 6682152, at *2 (S.D. Ohio Dec. 6, 2019), the court wrote that § 1595 "requires that Defendant knowingly benefit financially, not that the perpetrator compensate Defendant 'on account of' the sex trafficking.'"  In *M.A.*, Judge Marbley noted that the exacting definition of "benefit" that the

hotel defendants demand is not supported by the caselaw.  *M.A.*, 425 F. Supp. 3d at 964.  The *M.A.* opinion pointed to a Colorado case where "the District Court of Colorado interpreted § 1595 liability premised on § 1589(b) (the forced labor provision of the statute) ***not*** to 'require[ ] the party to benefit from the [forced] labor or services for liability to attach"  and that the Colorado court "found that the defendant had received a benefit through 'collecting money through sponsorships, licensing, grants, publicity, [and] for medals achieved at competitions.'" *Id.* (quoting *Gilbert,* 2019 WL 4727636, at *16) (citation omitted) (emphasis added)).    The *M.A.* court also pointed out that in a California case "the court looked to the relatively small portion of seafood a seller procured from a facility that engaged in human trafficking and that the defendant never actually sold any product that was made at the facility." *M.A.*, 425 F. Supp. 3d at 965 (citing *Ratha v. Phatthana Seafood Co., Ltd.*, No. CV 16-4271-JFW (ASx), 2017 WL 8293174, at *6 (C.D. Cal. Dec. 21, 2017)).  Based on these cases, the *M.A.* court said that **"**M.A. has alleged that Defendants rented rooms to the trafficker, and therefore benefited financially. This Court finds that the rental of a room constitutes a financial benefit from a relationship with the trafficker sufficient to meet this element of the § 1595(a) standard." *M.A.*, 425 F. Supp. 3d at 965.

On April 22, 2020, the Eastern District of Pennsylvania concurred with Judge Marbley's conclusion. *A.B.*, 2020 WL 1939678, at *15.  In *A.B.*, similar to this case, the plaintiff alleged that "her trafficker rented rooms for weeks at a time, paid with a prepaid credit card, checked her in with little personal belongings, a steady stream of male visitors entered the hotel through the front doors and main lobby, and the rooms bore signs of illicit sexual activity" and that "Marriott knew or should have known of these 'red flags' but nevertheless continued to rent rooms to A.B.'s traffickers and received financial benefit from sex trafficking."  *Id.*  The *A.B.* Court said these allegations "are sufficient to meet the 'knowingly benefitted' element of a civil claim under section

1595 of the Act." *Id*.

Here, Jane Doe has alleged that she rented rooms for multiple nights, but only rented one night at a time, renewing just before check out each day, that she checked in with very little in the way of personal belongings, that there were a steady stream of male visitors, that she always turned away housekeeping and took out her own garbage (so that they could not see the paraphernalia in her garbage), that hotel staff knew what was going on at the property and that La Quinta hotels ignored these red flags so they could provide a safe location for sexual exploitation to take place and continue receiving the room revenue.  Doc.164, pp.11-12, ¶ ¶ 53-60; pp.15-17, ¶ ¶ 72-78.

**Ms. Doe adequately alleged that La Quinta knew or should have known of an act in violation of the TVPRA**

La Quinta's final argument appears to be that Ms. Doe has failed to allege that La Quinta knew or should have known that trafficking was taking place because Ms. Doe did not allege that the La Quinta managers who were aware of the trafficking "interacted with Plaintiff's alleged trafficker, much less that they [the managers] witnessed him [the trafficker] forcing or coercing Plaintiff to engage in commercial sex activity."  Doc. 171, p.10.  There is no such pleading requirement to state a claim under the TVPRA.

For example, in *M.A.*, Judge Marbley discussed the *Ricchio* case and recognized that the *M.A.* plaintiff's "facts do not suggest a direct agreement between her trafficker and any of the hotel defendants" or that "a specific hotel staff member saw her in a deteriorated state."  425 F. Supp. 3d at 966.  "But," wrote Judge Marbley, "M.A. does not need to prove reckless disregard under § 1595(a), only that the Defendants 'should have known' about the nature of the venture under a negligence standard. ***This does not require evidence of actual knowledge or conspiracy between Defendants and the trafficker.***"  *Id*. (emphasis added).

In *A.B.*, the court found that the following allegations, which are similar to the facts alleged

by Jane Doe, were sufficient to "plausibly allege Marriott knew or should have known of a sex

trafficking venture involving A.B." at its hotels:

> we read A.B.'s allegations regarding the hospitality industry generally as background and supporting A.B.'s allegation Marriott, along with other hotel brands, knew about the problem of sex trafficking. We draw all reasonable inferences from A.B.'s amended complaint on a motion to dismiss: between 2009-2011, A.B.'s traffickers used Marriott's three Philadelphia Airport hotels to sell illegal sex acts; as many as six men an evening entered each of the three hotels as an "unannounced guest," creating a "voluminous and obvious" constant stream of male visitors to A.B.'s rooms accessed through the front door and main lobby of the hotels; A.B.'s trafficker repeatedly paid for rooms at each of the three hotels for at least a week at a time with prepaid credit cards and hotel staff were aware of A.B.; when A.B.'s trafficker brought her to the hotels, she presented with little, if any, luggage, no phone, wallet, or identification, and when checking A.B. into the hotel, he would not proceed to the room; rooms rented for trafficking were littered with multiple broken objects, used condoms, and other sex paraphernalia which would have been noticed by staff; and staff at all three hotels observed A.B. with signs of visible injury on more than one occasion, frequent loud altercations, and attacks on A.B. by her trafficker were constant and loud enough for hotel patrons and staff to hear.
>
> …
>
> At this stage, we can readily interpret A.B. as pleading Marriott should have known of a sex trafficking venture at the three airport hotels. Unlike a one-time visit, A.B.'s pleaded return visits with similar characteristics also allow us to infer Marriott knew of the sexual trafficking in A.B.'s prepaid hotel room.

*A.B.*, 2020 WL 1939678, at *17.

Similar to *A.B.*, Ms. Doe has alleged that La Quinta "financially benefited" from her

trafficking because, "[i]n exchange for providing a location for Plaintiff's continued sexual

exploitation, La Quinta [ ] received cash for every night Plaintiff was exploited in her rented room"

and "continued renting the room despite the red flags that called attention to human trafficking."

Doc.164, pp.18-19, ¶ 27; pp.20-21, ¶ 96.  More specifically, Ms. Doe alleged that La Quinta knew

about the hotel industry standards and refused to sign or participate in the Hotel Code of Conduct

(Doc. 164, p.18, ¶ 86; p.20, ¶ 95.), that it would be highly unusual for such a young person to have

accumulated so many reward points for staying at La Quinta hotels, that there was a steady stream

of men in and out of her rooms, that the rooms were rented one night at a time but renewed for

multiple nights, always paying with cash or a pre-paid credit card, that Jane Doe checked in with

little to no personal possessions, that her trafficker hid drugs near her rooms in full view of security

cameras but no one said anything, that hotel managers knew she was being trafficked, and that she

turned away housekeeping and changed her own linens to avoid detection. Doc.164, pp.17-19, ¶ ¶

83-86; pp.19-20, ¶¶ 92-95. Ms. Doe's allegations are sufficient to give rise to an inference that La

Quinta knew or should have known that there was a sex trafficking venture going on at their

properties.

## <u>Conclusion</u>

For the foregoing reasons, the motions to dismiss filed by CPLG FL Properties LLC (Doc.

171) should be denied.

*/s/ Maegen Peek Luka*

**C. RICHARD NEWSOME, ESQUIRE**
Florida Bar No.:  827258
**R. FRANK MELTON, ESQUIRE**
Florida Bar No.: 0475440
**MILETTE E. WEBBER, ESQUIRE**
Florida Bar No.:  145874
**MAEGEN PEEK LUKA**
Florida Bar No.: 549851
**NEWSOME MELTON**
201 South Orange Avenue, Suite 1500
Orlando, Florida 32801
Telephone: (407) 648-5977
Facsimile: (407) 648-5282
*Attorneys for Plaintiff*
*newsome@newsomelaw.com*
*melton@newsomelaw.com*
*webber@newsomelaw.com*
*swinehart@newsomelaw.com*
*oneill@newsomelaw.com*
*luka@newsomelaw.com*

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on June 1, 2020 a true and correct copy of the foregoing was

furnished by CM/ECF to all counsel of record as listed below.


/s/ *C. Richard Newsome*

*Attorney*

J. Trumon Phillips
Florida Bar No. 84568
Fredrick H.L. McClure
Florida Bar No. 147354
**DLA PIPER LLP (US)**
3111 W. Dr. Martin Luther King Jr. Blvd., Suite 300
Tampa, Florida 33607-6233
Phone:  813-229-2111
Fax:  813-229-1447
Email: Fredrick.mcclure@dlapiper.com;
        trumon.phillips@dlapiper.com
        Sheila.hall@dlpiper.com

David Sager (*pro hac vice* forthcoming)
**DLA PIPER LLP (US)**
51 John F. Kennedy Parkway, Suite 120
Short Hills, NJ 07078-2704
Phone: 973-520-2550
Fax: 973-520 2551
Email: david.sager@dlapiper.com

*Attorneys for Defendants, CPLG of FL, LLC,*
 *CPLG of FL, LLC dba La Quinta Inn*
 *Fort Lauderdale Tamarac East #4006 and*
 *La Quinta located at 7901 SW 6th St. Plantation*

Joseph J. Goldberg
Florida Bar No. 91107
Lindsey A. Adler
Florida Bar No. 1010168
**Cole Scott & Kissane, P.A.**
9150 South Dadeland Blvd., Suite 1400
Miami, FL 33256
Phone:  Phone:  305-350-5300
Email*: joseph.goldberg@csklegal.com*
        *Lindsey.Adler@csklegal.com*

*Attorneys for Defendants Rickey Patel, LLC d /b/a Vacation Inn and Sky Motel, Inc.*

Bruce Trybus
Florida Bar No. 972983
Kelly Lenahan
Florida Bar No. 106068
**Cooney Trybus Kwavnick Peets**
1600 W. Commercial Blvd., Suite 200
Fort Lauderdale, FL 33309
Phone:  954-568-6669
Fax:  954-568-0085
Email: reception@ctkplaw.com
         yhall@ctkplaw.com
         tzerof@ctkplaw.com

*Attorneys for Defendant*
*MW Plantation, LP d/b/a Sawgrass Inn & Conference Center*